UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AL OTRO LADO,
   Plaintiff,

v.

UNITED STATES CUSTOMS AND BORDER PROTECTION,

   Defendant.

Civil Action No. 22-1280 (CKK)

DECLARATION OF PATRICK HOWARD

I, Patrick Howard, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

  1. I am a Branch Chief in the Freedom of Information Act ("FOIA") Division, of the Privacy and Diversity Office, under the Office of the Commissioner, U.S. Customs and Border Protection ("CBP"). I have been a Branch Chief in the FOIA Division in Washington, D.C. since February 8, 2015.  In this capacity, I oversee a staff of Government Information Specialists, the processing of requests for records submitted to CBP pursuant to the FOIA, 5 U.S.C. § 552, the Privacy Act ("PA"), 5 U.S.C. § 552a, and other activities conducted pursuant to applicable records access provisions.

  2. I am familiar with CBP's procedures for responding to FOIA requests.  I provide technical and administrative supervision and direction to a group of FOIA specialists in processing FOIA requests and assist with FOIA/PA litigation matters, and I am personally familiar with the processing of FOIA/PA responses.  I oversee the Government Information Specialists assigned to

1

FOIA litigation cases, assign new matters to FOIA specialists, and am thus personally familiar with the FOIA Division's current caseload, available resources, and personnel.

3. I am familiar with Plaintiff's request for information from CBP related to the above captioned matter.

4. In furtherance of my responsibilities, I have access to records maintained in the ordinary course of business by CBP. All information contained herein is based upon information furnished to me in my official capacity, and the statements I make in this declaration are based on my personal knowledge, which includes knowledge acquired through, and agency files reviewed in, the course of my official duties.

5. This declaration describes the FOIA Division's current workload and resource constraints, provides an overview of the FOIA Division's process for responding to FOIA requests, situates Plaintiffs' FOIA request in that context, describes the FOIA Division's efforts with regards to the search and review of documents in this case, and describes the Agency's plan for completing its response to Plaintiffs' requests.

<u>CBP's Current Resource Constraint and Workload</u>

6. CBP is a federal law enforcement agency comprised of more than 60,000 employees charged with enforcing hundreds of federal statutes. Approximately 45,000 of these employees are armed law enforcement officials engaged in carrying out CBP's expansive border security mission (U.S. Border Patrol Agents, CBP Officers, and CBP Air and Marine Agents).

7. Despite the large size of CBP as an organization, the FOIA Division currently consists of merely thirty-two (32) full-time Government Information Specialists ("GIS"), six (6) FOIA assistants, one (1) student intern, five (5) supervisory branch chiefs, including myself, and one (1) director. The FOIA Division currently has 13 vacancies. None of these employees are

attorneys. FOIA assistants mainly work on retrieving documents for and otherwise assisting with responses to simple FOIA requests for traveler information. Of the five (5) supervisorybranch chiefs, I am the only one assigned to oversee the Government Information Specialists assigned to FOIA litigation cases.

8. A Government Information Specialist ("GIS"), sometimes referred to as a FOIA processor, is tasked with reviewing information and providing advice and assistance to managers and employees throughout the agency concerning FOIA issues, policies, and procedures. They are also responsible for processing FOIA requests for CBP records, a process that involves reviewing requests to determine scope, working with requestors to refine requests, and initiating searches directly or through relevant agency program offices, and reviewing the content of records to determine the proper disclosure under FOIA. A GIS is responsible for reviewing and preparing draft responses to requests for releases of information, and in so doing, must apply, and ensure compliance with, any relevant statute, regulation, executive order and/or department or agency policy as they pertain to FOIA requests.

9. Branch Chiefs in the FOIA Division oversee the release of CBP documents and information pursuant to the FOIA, including active support in FOIA litigation matters, and ensure adherence to federal laws and regulations in connection therewith. Branch Chiefs also are responsible for managing the development of agency FOIA-related policy and advising Agency management about current litigation issues and decisions, including how it may affect future processing or office functions.

10. The FOIA Division, with its highly limited workforce, is tasked with an extremely onerous caseload. In Fiscal Year ("FY") 2017, the number of FOIA requests dramatically increased than the preceding years. Over the past four years, that number has continuously and

sustainably increased, save for a brief decline in 2020, likely attributable to the COVID-19 pandemic. The Agency received 86,278 in FY 2019; 80,457 in FY 2020; 108,181 in FY 2021; 132,177 in FY 2022; and 144,475 in FY 2023. As of January 11, 2024, CBP has received 40,500 requests in FY 2024. The Fiscal Year runs from October 1 to September 30.

11. Although in Fiscal Year 2023, FOIA closed 89,728 cases, the office still had 102,308 pending requests at the end of the Fiscal Year.

12. The high number of FOIA requests, combined with the FOIA Division's limited resources, means that the delay in processing many requests will result in litigation. As of January 2024, the agency is a named defendant in approximately 60 FOIA cases in litigation, which encompass at least 95 individual requests. The FOIA Division is responsible for complying with processing orders or agreements in many of these litigations, and is actively processing records on a monthly basis in at least 40 different litigations. This collectively requires FOIA to process approximately 13,800 pages on a monthly basis for cases in litigation, which must be done in addition to processing the very high volume of non-litigation FOIA requests.

13. These workload demands have placed the FOIA Division under considerable stress, as its limited FOIA processing staff and resources struggle to meet the mounting court ordered processing mandates, while also seeking to respond to the other myriad FOIA requests before they end up in litigation or result in additional court orders.

CBP's Process for Responding to FOIA Requests

14. Broadly, the FOIA Division at CBP reviews FOIA requests, determines whether responsive records exist, and, if so, whether they can be released in accordance with the FOIA. In processing such requests, the FOIA Division consults with CBP personnel and, when appropriate,

with other components in the Department of Homeland Security ("DHS"), as well as other Executive Branch agencies.

15. Generally speaking, when the CBP FOIA Division receives a FOIA request that reasonably describes the records requested and complies with the Agency's rules governing the procedures for FOIA requests, it initially searches for and retrieves, potentially responsive records.

16. The FOIA Division identifies incoming FOIA requests as either simple or complex. A simple request—also referred to as a traveler request—is one where a member of the traveling public requests records related to their travel. Examples of traveler requests include records of a person's entry into and exit from the United States, I-94 records, and records of inspections and interactions with CBP employees. The FOIA Division generally has access to CBP's travel database systems and is able to query the systems in order to quickly respond to simple FOIA requests.

17. Complex FOIA requests—also referred to as non-traveler requests—are all other types of requests received. Examples of complex requests include requests from businesses for import and export records, requests for Office of Professional Responsibility ("OPR") investigation files, and requests from media sources or special interest groups seeking records, often on a broad range of topics not specific to an individual traveler. For many complex requests, the language of a FOIA request may be unclear or extraordinarily broad, and the FOIA Division must first work with the requestor to refine the language of the request in order to effectively conduct a search. The FOIA Division must then determine which CBP offices are likely to have responsive information and then work with those offices to gather any responsive records. Assessments of where responsive records are likely to be maintained are based on a review of the content of the request itself and the nature of the records sought, as well as the FOIA Division's

familiarity with the types and location of records that each CBP office maintains and discussion with knowledgeable Agency personnel. The more topics covered within a complex FOIA, the greater the likelihood multiple offices will need to be involved to gather and review responsive records. Potentially responsive records may be located in one or multiple systems of records, email systems, computer hard drives, and/or hard-copy files.

18. Based upon my experience, in a typical fiscal year, approximately 85% of the total volume of FOIA requests will be simple requests and 15% of the total volume will be complex requests.

19. Once the FOIA Division has completed its search and located potentially responsive records, it must process them for release. Processing records requires: (1) reviewing records for responsiveness to the request, and (2) reviewing responsive records to excise and withhold information that falls within any one or more of the FOIA's statutory exemptions from disclosure. See 5 U.S.C. § 552(b).

20. In order to review responsive records for information exempt from disclosure, a CBP FOIA processor must: (1) meticulously examine, line-by-line, each responsive page to identify potential redactions; (2) coordinate with relevant operational offices to confirm the extent to which certain redactions should be made; (3) apply redactions (if necessary); and (4) individually label each redaction (which could be a name, email address or phone number, a single word or phrase, or substantial portions of a document), with the applicable exemption or exemptions.

21. The detailed nature of the records at issue in these complex cases (often involving unique and lengthy narratives or policy statements) also involves a correspondingly more extensive and complex review process. CBP employs a multi-office review process to ensure that

all information that must be protected from release is properly withheld, and that all information that can be released is provided to requestors. Each page that CBP produces, in this and other complex litigation, will be reviewed by multiple subject matter experts. As noted above, this may involve review by multiple operational offices.

22. Where records potentially implicate the equities of another agency or component of DHS, CBP is also required to consult with that agency or component before such records are released. Once CBP sends records for such a consultation, the response time is not within the control of CBP.

23. Because Plaintiffs' FOIA request is in litigation, attorneys in the CBP Office of Chief Counsel are also involved. After the initial and secondary review by the FOIA Division, Office of Chief Counsel attorneys may conduct, or answer questions pertaining to, reviews for responsiveness and redactions for applicable FOIA exemptions, to ensure that CBP's assertion of exemptions are legally supportable. They may also assist with the identification of what, if any, outside agency equities exist in potentially responsive records. As noted above, the Agency currently has over 95 FOIA requests in litigation.

24. CBP's Office of Chief Counsel ("OCC") does not have a FOIA division with attorneys who are solely dedicated to the handling of FOIA matters; rather, FOIA cases are dispersed among the OCC attorneys, generally based on the jurisdiction in which a case is filed. OCC attorneys shoulder other responsibilities outside of the FOIA context, including but not limited to a currently large volume of high profile and very demanding immigration litigation. Depending upon competing priorities, OCC attorneys may be limited in their ability to carry out necessary review of FOIA productions related to pending FOIA litigation.

25. Only after all of these multiple levels of review are completed are the non-exempt portions of responsive records provided to the FOIA Division to release, as appropriate, to Plaintiffs.

The Search and Processing of Plaintiff's Request

26. Plaintiff's FOIA request is complex. The records sought here are substantively different from the types of records CBP routinely processes, and require more extensive efforts to search, review, and redact.

27. An ordinary request that has since moved into district court litigation involves one request, which may separately include multiple subparts.

28. However, the litigation in this matter actually pertains to *two* separate FOIA requests.

29. One request assigned tracking number CBP-2022-013430 ("humanitarian parole request") seeks certain records broadly regarding the use of humanitarian parole by CBP. This request consists of seven (7) separate subparts. The original humanitarian parole request was an extensive request that sought a wide range of different types of records ranging from policy and guidance documents to communication records and statistics. Six of seven of the subparts were further divided into as few as three (3) and as many as seven (7) additional parts.

30. For the humanitarian parole request, the parties successfully agreed on a scoping recommendation on August 21, 2023, which significantly reduced the burden in processing this request, and CBP began its search. On September 6, 2023, CBP issued its first interim response, which provided that CBP processed 9 pages of documents, and determined that 4 pages may be released in full or in part. CBP referred the other 5 pages to other government agencies for consultation. On December 14, 2023, CBP released its second interim response for CBP-2022-

013430, which provided that CBP processed 575 pages of documents and 8 lengthy spreadsheets that were potentially responsive to Plaintiff's request, and that these were determined to be nonresponsive.

31. The second request assigned tracking number CBP-2021-109650 ("biometric data collection and data sharing programs request"), seeks records broadly regarding biometric data collection and data sharing programs, and consists of twenty-one (21) separate subparts.

32. Even among the universe of complex requests, this request is uniquely complex in scope, depth, and type of records sought. The request comprised of twenty-one subparts (21) seeks records regarding seven (7) vastly different, and unrelated, programs or policies. One particularly burdensome aspect of the request seeks allcommunications any Commissioner or Acting Commissioner of CBP sent, received, was cc-d on, or bcc-d on from January 1, 2018 regarding six (6) of these programs or policies, and all communications the Secretary of the Department of Homeland Security (DHS) sent, received, was cc-d on, or bcc-d on regarding the remaining one (1) program or policy. The request seeks records, including these communications, related to programs of other agencies, and associated policies, for which CBP may have little to no involvement, but nonetheless may have copies of documents regarding the programs.

33. For the biometric data collection and data sharing programs request, on September 15, 2023, CBP approached Plaintiff in good faith with proposed scoping language to allow for more effective and efficient processing. CBP indicated in its scoping recommendation that many of the items in Plaintiff's request sought records related to programs of other agencies, and associated policies; that a search of CBP records is unlikely to reveal responsive records; and if records are responsive, they likely are other agency records which would require referral to those

agencies for processing. CBP identified the responsible agencies and suggested that Plaintiff request these records from these agencies.

34. On October 2, 2023, Plaintiff declined CBP's scoping recommendation in whole.

35. On November 2, CBP began the search for Plaintiff's second request without the benefit of any requested refinement. Given the breadth of the search, this took several weeks to complete. As anticipated, the search (which included an extensive electronic search) related to the unrefined request has yielded a large number of records, the overwhelming majority of which are likely unresponsive to this request and likely contain equities of agencies or components not parties to this litigation, which will require further consultation. Of the very small sample reviewed so far, we estimate that only approximately 1% of the records are responsive.

36. Specifically, the biometric data collection and data sharing programs request electronic search has thus far yielded over 146,900 pages and 210 spreadsheets (which tend to be lengthy). Given the broad nature of the request, and limited information Plaintiff has provided about the documents it seeks, CBP is unable to meaningfully refine the search without further information from Plaintiff. For example, even excluding collected extracts from media articles circulated daily, this would only remove less than 5,000 pages. CBP is in the process of analyzing the results to prepare, once again, to seek additional information from Plaintiff to further refine the request.

37. CBP has and continues to process Plaintiffs' two requests as quickly as is practicable in light of the resource constraints and inability to reach agreement with Plaintiff on refinement, as described above. CBP also expects to request, once again, that Plaintiff further refine the request to reduce the burden and time in processing such a large number of likely

nonresponsive records, and increase the likelihood that CBP is processing records best targeted to those that Plaintiff seeks.

<u>The Effect of a Court-Ordered Processing Schedule on Other Requests Before CBP</u>

38. Given the sheer number of FOIA requests, seeking these and similar records, CBP's FOIA processing resources are already under tremendous strain. The strain is exacerbated when, such as with this case, there are other requests in litigation that address a similar subject matter or topic. In those instances, FOIA specialists also must coordinate the processing between them to ensure consistency and address any overlap in scope.

39. The entry of production orders, in particular ones that require processing well beyond our normal capacity, has a direct and serious impact on CBP's overall FOIA program, resulting in an increased backlog that raises the risk of additional litigation and, more importantly, prevents CBP from getting information to the people requesting it. Demanding production orders also take resources away from CBP's ability to process simple requests as well.

40. CBP cannot feasibly commit to "producing" a certain number of records per month, as the number of records processed depends on the breadth of the request and the amount of responsive and non-responsive records. If a Plaintiff, such as here, submits a very broad request and declines to refine that request, if a search is conducted, there will be a greater likelihood of nonresponsive documents being pulled in that search.

41. Ordinarily, CBP processes requests on a first-in, first-out basis.

42. When CBP is given a court-ordered processing schedule, the effect is to move that request ahead of earlier-filed requests, causing other filers to suffer a delay in the processing of their requests.

43. Individual case-processing schedules like those entered in other FOIA cases lower CBP's overall processing rate. Preparing document releases is time consuming, and each release requires roughly the same amount of time regardless of the volume of documents involved. Thus, as there are more scheduled releases, CBP has less time and fewer resources to devote to the review of documents and ensuring that the review is being conducted in the most efficient manner possible.

44. CBP's normal processing rate for cases in litigation is to process between 250 and 500 pages a month. If the FOIA Division is ordered to process 500 pages a month, with accompanying indices, the strain will be immense. It is anticipated that the FOIA Division will have to pull a large number of its staff members off of their current projects, which include processing and review of other litigations and administrative requests, as well as requests filed or orders issued prior to Plaintiff's requests, to aid in the processing of this litigation to meet this Court's order. This will result in other FOIA requesters not receiving material related to their FOIA requests and potentially other litigation deadlines being missed. Missing other litigation deadlines and/or not processing administrative FOIA requests will only lead to more litigation and more aggressive court-ordered processing schedules thereby compounding the severity of the situation.

45. Moreover, Plaintiff has not provided any suggestion of any alleged imminent threats to life and safety or other urgent matters that might be jeopardized if the records requested by Plaintiffs are not released at a faster rate. Nor has Plaintiff provided any rationale why its requests should be provided priority processing over other requests, including those in litigation and facing tight processing orders.

46. In sum, based on the complex nature of Plaintiff's request and the significant resource limitations faced by the CBP FOIA Division, as discussed above, I do not believe CBP could currently achieve a processing schedule as requested by Plaintiffs without diverting resources from and thereby unduly prejudicing other earlier-filed FOIA requests and FOIA requests that are subject to court-ordered processing schedules.

47. CBP is now processing Plaintiffs' request as quickly as is practicable in light of the resource constraints described above.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 16th day of January, 2024, in Washington, D.C.

*Patrick Howard*

Patrick A. Howard